Lake House Academy for Girls LLC v. Jennings, 2011 NCBC 40.

| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
|---|---|---|
| | | SUPERIOR COURT DIVISION |
| COUNTY OF HENDERSON | | 11 CVS 1666 |

| | | |
|---|---|---|
| LAKE HOUSE ACADEMY FOR GIRLS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| CATHERINE JENNINGS, | ) ) | |
| Defendant. | ) ) | |

THIS MATTER, designated a complex business case by Order of Chief Justice Parker dated September 12, 2011 and assigned to this Court on September 16, 2011, is before the Court on Plaintiff Lake House Academy for Girls LLC's Motion for Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, the Motion is GRANTED.

> *Alice Carmichael Richey, PLLC by Alice Carmichael Richey and Sarah J. Kromer PLLC by Sarah J. Kromer for Plaintiff Lake House Academy for Girls LLC.*

> *David R. Payne, P.A. by David R. Payne for Defendant Catherine Jennings.*

Gale, Judge.

## I. INTRODUCTION

This case arises out Defendant Catherine Jennings' ("Mrs. Jennings" or "Defendant") membership interest in and employment with Plaintiff Lake House Academy for Girls LLC ("Lake House"). Plaintiff contends that while serving as a member-manager and Executive Director of Lake House, and in violation of employment covenants, Defendant engaged in deleterious actions that caused

irreparable injury to the organization. Lake House asserts claims against Mrs. Jennings for breach of fiduciary duty by a member-manager, constructive fraud, conversion, breach of contract, misappropriation and threatened misappropriation of trade secrets, tortious interference with a contract, unfair and deceptive trade practices, and injunctive relief under Rule 65. Mrs. Jennings opposes the Motion asserting that she neither owed nor breached any fiduciary duty to Lake House in pursuing her right to earn a livelihood.

As a member-manager of a limited liability company and as its Executive Director, Mrs. Jennings owed certain fiduciary duties to Lake House. Plaintiff contends Mrs. Jennings breached those fiduciary duties by (1) engaging in a calculated scheme to open and/or operate a competing entity; (2) soliciting former employees of Lake House; and (3) using Lake House's confidential and proprietary information for her own benefit. While these same acts were asserted as breaches of employment covenants, the Court focuses on the breach of fiduciary duty claim to address Plaintiff's likelihood of success on the merits.

## II.  FINDINGS OF FACT

THE COURT, having considered live testimony at an evidentiary hearing, affidavits, briefs, arguments, and supporting materials, makes the following FINDINGS OF FACT, only for the limited purpose of determining the Motion:

{1}  Plaintiff Lake House Academy for Girls LLC is a North Carolina limited liability company with a principal place of business in Flat Rock, North Carolina. Lake House owns and operates Lake House Academy for Girls, a residential therapeutic program for girls between the ages of ten (10) and fourteen (14). Lake House Academy for Girls is located in Flat Rock, North Carolina. Roy B. Cook ("Cook") is a citizen and resident of Mecklenburg County and is a member-manager and the majority interest holder in Lake House.

{2} Defendant Catherine Jennings is a citizen and resident of McDowell County, North Carolina. Mrs. Jennings is a member-manager[1] and the minority interest holder in Lake House.

### A. The Genesis of Lake House Academy for Girls LLC

{3} Cook and Mrs. Jennings have a long standing relationship, and both have committed substantial time and resources to children in need of therapeutic and behavioral treatment. (Testimony of Cook; Testimony of Mrs. Jennings.)[2]

{4} Mrs. Jennings has provided services for children in need of residential therapeutic treatment for nearly 30 years. Throughout that time, she has been employed by and affiliated with a number of institutions including the New Leaf Academy of North Carolina ("New Leaf") where she served as Executive Director until its close in June 2010. (Am. Compl. ¶ 8.) Upon its close, Mrs. Jennings became the Executive Director of Lake House Academy, which was owned by Peter Newman ("Newman") through Lake House Academy, LLC ("LHA"). (Am. Compl. ¶ 8.) The relationship between Newman and Mrs. Jennings quickly soured, and Newman began to explore the sale of LHA's assets. (Testimony of Mrs. Jennings.)

{5} In June 2010, Mrs. Jennings approached Cook and inquired about his interest in investing in LHA. (Am. Compl. ¶ 10.) On August 11, 2010, Mrs. Jennings and Newman presented Cook with a Confidential Private Placement Memorandum ("Prospectus") which identified LHA as one of only two (2) programs in the entire country that provided residential therapeutic treatment to girls between the ages of ten (10) and fourteen (14) ("Target Population"). (Am. Compl. ¶ 10.) The other program was located in Bend, Oregon. The Prospectus provided that

---

[1] Mrs. Jennings wrote a letter dated October 2, 2011 purporting to resign as a manager while remaining as a member. The Court questions whether that resignation was effective because the Operating Agreement provides that "[e]ach Member of the Company, by virtue of its status as a Member, shall also be a Manager of the Company for all purposes," but there is no provision relating to a managers ability to resign and maintain member status. (Operating Agreement § 3.1(a).) It is uncontroverted that Mrs. Jennings was a manager prior to October 2, 2011, although she claims she was a manager in name only without the authority of a manager.

[2] References to "Testimony" refer to live testimony produced at the Preliminary Injunction Hearing held on October 4, 2011.

LHA was the only program convenient for the Target Population east of the Rocky Mountains. (Am. Compl. ¶ 10.) When Cook was considering the investment, LHA was in the process of opening its school and had no operating history. (Prospectus 9.)

{6} Based on Mrs. Jennings' affirmative representation that Lake House Academy for Girls would be the only program on the east coast providing services to the Target Market, Cook decided to invest and Lake House was formed to facilitate the purchase of LHA's assets. (Am. Compl. ¶ 11.) The Lake House Operating Agreement provided that Cook and Mrs. Jennings would be the sole member-managers of the limited liability company, with Cook owning a seventy-five percent (75%) interest and Mrs. Jennings owing the remaining twenty-five percent (25%) interest. (Operating Agreement 3, 30) Under its terms, "[e]ach Member of the Company, by virtue of its status as a Member, shall also be a Manager of the Company for all purposes." (Operating Agreement § 3.1(a).) Cook would provide the working capital,[3] and Mrs. Jennings would serve as the Executive Director of the school. (Am. Compl. ¶ 12.) In her capacity as Executive Director, Mrs. Jennings would be responsible for the management and operations of Lake House. (Am. Compl. ¶ 12.) She would be required to exercise control over the hiring and firing of employees and the selection of vendors, and serve as the primary contact for parents, guardians, students, referral services, clinicians, therapists, educational consultants, and employees of the school.

{7} On October 20, 2010, Lake House and LHA executed an Asset Purchase Agreement ("APA"). (Preliminary Injunction Hr'g ("PI Hr'g"), Ex. 30, Oct. 4, 2011.) The APA contained several restrictive covenants prohibiting Newman from competing with the school in certain territories for a period of three (3) years, but no similar provisions relating to Mrs. Jennings. (PI Hr'g, Ex. 30 at § 6.2.)

{8} As part of her employment with the new school, Mrs. Jennings signed a Business Confidentiality Agreement ("Confidentiality Agreement"). (Am. Compl. Ex. 2.) The Confidentiality Agreement obligated Mrs. Jennings to keep certain

---

[3] Cook testified that he has invested at least $600,000.00 in Lake House since its inception.

Lake House information confidential and prevented her from soliciting or encouraging any employees to terminate their employment with Lake House during her service as Executive Director and for one year thereafter. (Am. Compl. Ex. 2.) She was provided with a laptop computer which contained confidential Lake House documents including parent contact information, student information, and documents used in the operation of Lake House. (Am. Compl. ¶ 18.) The laptop computer also contained proprietary and confidential information protected from disclosure under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). (Am. Compl. ¶ 19.)

## B. Mrs. Jennings' Plan to Open a Competing Residential Therapeutic Treatment Facility

{9} Mrs. Jennings' relationship with Cook quickly began to deteriorate. Mrs. Jennings testified that she grew frustrated with her lack of autonomy and began to lose confidence in Lake House as an organization. (Testimony of Mrs. Jennings.) Cook heard rumors of Mrs. Jennings' plan to open a competing school and began to question her dedication to Lake House. (Testimony of Cook.) Cook then increased his involvement in the day to day operations of the school. (Testimony of Cook.)

{10} Mrs. Jennings asserts that she was a manager of Lake House in name only and was never vested with individual decision making authority. (Testimony of Mrs. Jennings.) She testified that she participated in meetings with employees, vendors, parents, guardians, students, referral services, clinicians, and therapists and provided suggestions regarding Lake House operations; but complained that Cook made the ultimate decision with respect to all management issues. (Testimony of Mrs. Jennings.) She further suggested that Cook uses Lake House as an alter ego to his other company, Duo-Fast Carolinas, Inc., but failed to provide documentary evidence to support her contention. The Court is not convinced that Mrs. Jennings was denied a meaningful opportunity to manage Lake House and finds that the decision making processes employed by Cook is entirely consistent

with the terms of the written Operating Agreement and Cook's status as owning the majority-in-interest.

{11} In June 2011, Mrs. Jennings acted on her frustrations and set in motion a plan to open a competing entity in Weaverville, North Carolina serving the same Target Population. She did not resign as the Executive Director or as a manager of Lake House at that time.

{12} On June 5, 2011, Mrs. Jennings sent an e-mail to her husband Keith Jennings ("Mr. Jennings") which forwarded Lake House documents entitled "LHA Business Plan.doc," "Parent Manual 5-11.pdf," "Operations Plan New School 2010 Final.docx," "LHA Program Description 9.20.10.doc," "Lake House Academy Brochure.pdf," and "Competitor Analysis 03 2010 New School.doc." (Am. Compl. Ex. 5.) It is unclear when these documents were prepared and who prepared them.

{13} On June 6, 2011, Mrs. Jennings called Beth Padgett ("Padgett") into her office, closed the door, and threatened her employment with Lake House. (Am. Compl. ¶ 25.) She accused Padgett and Shannon Worley ("Worley") of trying to "get rid of" Rebecca Jeffries ("Jeffries"), who was the acting Program Manager. (Aff. of Beth Padgett ("Padgett Aff.") ¶ 3.)[4] Padgett asserts

> [Mrs. Jennings] stated vehemently and emotionally that [Jeffries] was here to stay and that if [Jeffries] did go, she would go, and take everyone with her. She said the school would shut down, the girls would not have a place to go and everyone would lose their jobs. She said "there would not be an educational consultant in the country who would make a referral to [Lake House]; I will make sure of that."

(Padgett Aff. ¶ 3.) Padgett asked what she meant by everybody, and Mrs. Jennings said Bryan Tomes ("Tomes"), Lake House's Academic Director. She told Padgett that "she was giving 'this 30 days to straighten out' and if it did not she was going and the school would shut down." (Padgett Aff. ¶ 3.)

{14} On the afternoon of June 6, 2011, Mrs. Jennings called Worley into her office, closed the door, and threatened her employment with Lake House. (Am.

---

[4] Padgett testified at the evidentiary hearing, was cross-examined by Defense counsel, and affirmed her testimony by affidavit.

Compl. ¶ 26.)  She accused Worley and Padgett of being disrespectful to Jeffries and told her that "no matter how hard [you] try to get rid of [Jeffries], [she] was not going anywhere, and if she did, [Mrs. Jennings] would go as well."  (Aff. of Shannon Worley ("Worley Aff.") ¶ 3.)[5]  Worley asserts

> [Mrs. Jennings] then stated if within 30 days, we did not start treating [Jeffries] better, [she] would leave [Lake House] and take [Jeffries] and [Tomes] with her.  She began to yell and said that if she, [Jeffries], and [Tomes] left, they were going to start up another school and that they would make sure that no one would ever enroll another student at Lake House Academy and that she would make sure the school shut down and that we would all lose our jobs.

(Worley Aff. ¶ 3.)

{15}  On June 29, 2011, Mrs. Jennings had a telephone conversation with Dr. Brooke Judkins ("Judkins"), Lake House's Clinical Director.  (Aff. of Brooke Judkins ("Judkins Aff.") ¶ 3.)[6]  According to Judkins,

> [Mrs. Jennings] told me that she was planning on "things not working out" for her with Lake House Academy.  She stated that she was planning to start a new school and had found a new location.  The school was to be a residential therapeutic program like the program at Lake House Academy.  She told me that Rebecca Jeffries and Bryan Tomes were "on board."  [Mrs. Jennings] said she wanted to hire me to be the Clinical Director of the school.  [Mrs. Jennings] was leaving to go on vacation the next day and said she was going to work on getting a lease in place for the location while on vacation.
>
> Following the conversation, [Mrs. Jennings] sent me an email with a link to the property which was to be the new school.  The Property shown in the link is the same property currently shown on the website for Glen Willow Academy.

(Judkins Aff. ¶ 3–4.)

---

[5] Worley did not testify at the evidentiary hearing but was tendered for cross-examination, which tender was declined.

[6] Judkins testified at the evidentiary hearing, was cross-examined by Defense counsel, and affirmed her testimony by affidavit.

{16} On July 22, 2011, Judkins informed Mrs. Jennings that she would not be joining the new school. (Judkins Aff. ¶ 5.) Judkins asserts "[Mrs. Jennings] told me that if I stayed I needed to know that she was 'going to try and shut Lake House down.' I responded that maybe both programs could survive. [Mrs. Jennings] said: 'Two programs in Asheville? No, that won't work.'" (Judkins Aff. ¶ 5.)

{17} On July 27, 2011, Cook met with Mrs. Jennings "to confirm her intentions to 'get out' [of Lake House] and set a date for her termination." (PI Hr'g, Ex. 31.) Mrs. Jennings' employment as Executive Director of Lake House Academy for Girls ended[7] effective July 28, 2011. (Am. Compl. ¶ 32.) Mrs. Jennings did not attempt to resign as a manager of the limited liability company at that time, and in fact, exercised her right to request financial information after her employment as Executive Director ended.

{18} As discussed more fully below, negotiations for the sale of Lake House to the Innerchange Group ("Innerchange") were on-going at this time. Mrs. Jennings acknowledges these negotiations may be adversely impacted if she opens a competing school serving the same Target Population. (Testimony of Mrs. Jennings.)

{19} No later than mid-July 2011, Mrs. Jennings contacted Steve Servais ("Servais"), a real estate broker with Keller Williams and Carolina Country Realty, and asked him to help facilitate the lease of a property to house the new school. (Testimony of Servais.)

{20} Servais is not an attorney, but on August 9, 2011, he submitted a Letter of Intent on behalf of Mr. and Mrs. Jennings for a property located at 530 Upper Flat Creek Road, Weaverville, North Carolina 28787 ("Glen Willow Property"). (PI Hr'g, Ex. 23.) Servais proceeded to form a North Carolina limited liability company called Fawkes Tears LLC ("Fawkes Tears") which listed Mr. Jennings as the sole

---

[7] Plaintiff contends Mrs. Jennings resigned and Defendant contends that Mrs. Jennings was terminated by Cook. The distinction is immaterial to the determination of the present Motion because undisputed evidence establishes that Mrs. Jennings continued in her capacity as a member-manager of Lake House until at least October 2, 2011. As detailed below and by virtue of her position as a member-manager of Lake House, Mrs. Jennings' fiduciary relationship extended beyond her employment as the Executive Director of the school.

member-manager. (Testimony of Servais.) The new school is Fawkes Tears d/b/a Glen Willow Academy.

{21} On August 15, 2011, Mr. Jennings executed a Consulting Contract with Servais on behalf of Fawkes Tears which provided that Carolina Country Realty would "supervise all work Necessary to Assist with the Opening of Glen Willow Academy and to act as the Operation Director for Fawkes Tears LLC DBA Glen Willow Academy. To assist Keith Jennings and Catherine Jennings with all operation and facets of opening an all-girls Boarding School." (PI Hr'g, Ex. 22.)

{22} On August 23, 2011, Mrs. Jennings, individually as "tenant," and Fawkes Tears executed a lease with PMG Properties LLC for the Glen Willow Property. (PI Hr'g, Ex. 26.) Mr. and Mrs. Jennings' initials or signatures appear on all sixteen (16) pages of the lease. The property is located approximately 41 miles from Lake House Academy for Girls. (Am. Compl. ¶ 51.)

{23} During this same time, while Mrs. Jennings had been removed as Executive Director, she continued as a member-manager of Lake House. On August 1, 2011, she informed Lake House that she would continue visiting the school because it was her right as a member-manager to do so. (Am. Compl. ¶ 36.) On August 6 and 7, 2011, Mrs. Jennings requested financial information as a member-manager of Lake House. (Am. Compl. Ex. 9.)

{24} On August 9, 2011, Mrs. Jennings circulated confidential and HIPPA-protected parent contact information by e-mail to Lake House parents and certain "friends" of the school directing them to a "Family Light" website which contained disparaging information about the veracity and competence of the Lake House faculty. (Am. Compl. Ex. 7.) On August 19, 2011, a classified advertisement for a new residential school for girls was circulated in the *Mountain Xpress*. (Aff. of Kimball DeLaMare ("DeLaMare Aff.") Ex. E.)[8]

{25} On August 22, 2011, Lake House discovered e-mail correspondence between Mrs. Jennings and former Lake House employee Tomes, discussing his

---

[8] DeLeMare testified and was cross-examined at the evidentiary hearing.

intention to leave Lake House and accept a job with Glen Willow Academy. (Am. Compl. ¶ 56.) Tomes resigned from employment with Lake House on August 25, 2011, signed an employment contract with Glen Willow Academy, and is listed as the Academic Director on the Glen Willow Academy website.[9]

{26} Since August 2011, Lake House made several attempts to repossess the laptop computer issued to Mrs. Jennings by virtue of her employment as Executive Director of Lake House. (Am. Compl. ¶ 48–50.) Both Mrs. Jennings and Servais testified that they retained the laptop computer because it contained confidential personal information relating to Mrs. Jennings. (Testimony of Servais; Testimony of Mrs. Jennings.) Rather than turning the computer over to a third-party forensic expert, or discussing the issue with counsel for Lake House to arrange the cooperative removal of information, at Servais' instruction, they deleted a number of documents from the laptop before Servais unilaterally arranged to have the hard drive wiped clean on or about August 29, 2011. (Testimony of Servais; Testimony of Mrs. Jennings.) Mrs. Jennings acknowledges that she began deleting matters before arranging for a supervised cleaning of the hard drive. Ultimately, no e-mails from the hard drive were preserved. The laptop computer was returned to Lake House some time after the matter was called for hearing on Plaintiff's Motion for Temporary Restraining Order ("TRO") on September 22, 2011. Only three (3) documents related to Lake House had been preserved from that computer.

{27} Under the terms of a consensual standstill agreement reached by the Parties on September 22, 2011 in lieu of a TRO hearing, Glen Willow Academy was precluded from operating as a residential therapeutic treatment facility until a preliminary injunction hearing. The parties agreed to continue the standstill agreement after the evidentiary hearing pending the Court's ruling on the Motion. Mrs. Jennings maintains that she intends to be an employee of Glen Willow Academy and that she does not have any ownership interest in the school. The

---

[9] Over Plaintiff's objection, the Court accepted an affidavit from Tomes which was not submitted to the Court or opposing counsel before the evidentiary hearing. Tomes was not present at the hearing and was not available for cross-examination.

testimonial evidence establishes that Glen Willow Academy is a joint venture between Fawkes Tears, which is owned exclusively by Mr. Jennings, and Wilderness Properties, LLC, an entity owned by Mrs. Jennings' mother and sister. (Testimony of Mr. Jennings.) Those parties have clearly acted in concert with Mrs. Jennings during the time preceding the evidentiary hearing, while Mrs. Jennings was employed as Executive Director, and while she remained a manager of Lake House.

{28} On October 2, 2011, Mrs. Jennings purported to resign as a manager of Lake House with the intent to maintain her twenty-five percent (25%) ownership interest.

{29} There is no indication that Mrs. Jennings or those in active concert with her have solicited any student to terminate their relationship with Lake House. However, it is clear that Glen Willow Academy will pursue the exact same Target Population if the school should open.

## C. The Innerchange/Lake House Relationship

{30} Lake House executed a consulting contract with Innerchange[10] in the Spring of 2011 seeking its assistance in the preparation of key documents central to the school's accreditation. (Testimony of Mrs. Jennings; Testimony of Cook; Testimony of Kimball DeLaMare.) After Mrs. Jennings was terminated as Executive Director of Lake House, Innerchange's Kimball DeLaMare ("DeLaMare") was appointed as her successor. (Testimony of Mrs. Jennings; Testimony of Cook; Testimony of DeLaMare.)

{31} Cook and Innerchange have been negotiating the sale of Lake House since June or July 2011. (Testimony of Mrs. Jennings; Testimony of Cook; Testimony of DeLaMare.) Mrs. Jennings participated in activities incidental to those negotiations while employed as the Executive Director. Plaintiff and Defendant both testified that the opening of Glen Willow Academy will likely materially alter the market value and purchase price of Lake House Academy for

---

[10] Innerchange operates at least three (3) residential treatment facilities in the United States.

Girls and perhaps cause the sale to fail entirely. (Testimony of Mrs. Jennings; Testimony of Cook; Testimony of DeLaMare.) The sale to Innerchange, if consummated, may benefit both Mrs. Jennings and Cook as members, and Mrs. Jennings has been in favor of the sale. (Testimony of Mrs. Jennings; Testimony of Cook.)

BASED UPON the foregoing FINDINGS OF FACT, the Court reaches the following CONCLUSIONS OF LAW:

### III. PRELIMINARY INJUNCTION

{32} "A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754 (1983). Issuance is proper only:

> (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*Id.* (citations omitted) (emphasis in original). The burden is on the moving party to establish its right to a preliminary injunction, but the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCNC 38 ¶ 29 (N.C. Super. Ct. Sept. 29, 2011),http://www.ncbusinesscourt.net/ opinions/2011_NCBC_38%20.pdf (citations omitted); *Travenol Lab., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E2d 478, 483 (1976).

{33} The grant of a preliminary injunction is binding upon the parties to the action, and upon "those persons in active concert or participation with them who receive actual notice in any manner of the order by personal service or otherwise." N.C. Gen. Stat. § 1A-1, Rule 65 (2011).

## A.    Breach of Fiduciary Duty[11]

{34}  To establish a claim for breach of fiduciary duty, "there must first exist a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citations omitted).  The North Carolina Supreme Court has defined a fiduciary relationship as

> one in which "there has been a special confidence reposed in one who in equity and good conscious is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact[.]"

*Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 472, 675 S.E.2d 133, 136 (2009).

{35}  Under the North Carolina Limited Liability Company Act, N.C. Gen. Stat. § 57C-1-01 *et seq.*, members of a limited liability company are treated like corporate shareholders and do not owe fiduciary duties to other members or the company.  *Kaplan*, 196 N.C. App. at 473, 675 S.E.2d at 137.  A manager of a limited liability company, however, "shall discharge his duties as manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner the manager reasonably believes to be in the best interest of the limited liability company."  N.C. Gen. Stat. § 57C-3-22(b) (2011).  N.C. Gen. Stat. § 57C-3-22(e) further provides

> [e]xcept as otherwise provided in the articles of organization or a written operating agreement, every manager must account to the limited liability company and hold as trustee for it any profit or benefit derived without the informed consent of the members by the manager from any transaction connected with the formation, conduct, or liquidation of the limited liability company or from any personal use by the manager of its property.

N.C. Gen. Stat. § 57C-3-22(e) (2011).

{36}  These fiduciary duties "are owed by the manager to the company, rather than to other managers."  *Kaplan*, 196 N.C. App. at 474, 675 S.E.2d at 137.  A

---

[11] As noted, for purposes of this Motion, the Court has focused on the breach of fiduciary duty claim. While the Confidentiality Agreement may provide a basis for preventing solicitation of students or employee's, or using some documents, it does not contain a restrictive covenant against competition.

director or executive in a limited liability company "shall be subject to the same requirements and afforded the same rights as . . . a manager when the director or executive exercises authority in the management of a limited liability company's affairs that would otherwise be vested in the managers[.]" N.C. Gen. Stat. § 57C-3-22(f) (2011).

{37} The Lake House Operating Agreement designates Cook and Mrs. Jennings as its sole members and provides "[e]ach Member of the Company, by virtue of its status as a Member, shall also be a Manager of the Company for all purposes."[12] (Operating Agreement § 3.1(a).) By virtue of her manager status, Mrs. Jennings owed Lake House a duty of good faith to act in the best interest of the company and a duty to account as trustee for any benefit derived without the informed consent of the other members.

{38} The North Carolina Limited Liability Company Act allows parties to vary a number of default statutory provisions in their written Operating Agreement. Allowing Mrs. Jennings to resign as manager while remaining as a member may well be equivalent to allowing her the unilateral right to amend the Operating Agreement. Again, the Court need not now resolve whether she was successful in resigning as a Lake House manager. Mrs. Jennings and those in active concert with her set in motion a plan to open a competing school, which was not in the best interest of Lake House, while Mrs. Jennings owed fiduciary duties to Lake House. Mrs. Jennings seeks to carry out that course of injurious conduct and requests that the Motion be denied to allow her to do so.

## B. Likelihood of Success on the Merits of Plaintiff's Claims

{39} The evidence before the Court supports Plaintiff's contention that Mrs. Jennings breached her fiduciary duties to Lake House, by herself and in active

---

[12] Although the duty of good faith is imposed by law, a written operating agreement can alter a manager's duty to account as trustee. N.C. Gen. Stat. § 57C-3-22(e) (2011). Mrs. Jennings did not elect to limit her duty to account as trustee in the Lake House Operating Agreement and now must suffer the consequences attendant to such an omission.

concert with Mr. Jennings, Fawkes Tears, Wilderness Properties, LLC, and Servais, by taking the following actions as Executive Director or as a member-manager of Lake House:

(a) On June 5, 2011, Mrs. Jennings e-mailed Mr. Jennings as many as six (6) documents used by Lake House in its operation of Lake House Academy for Girls.[13]

(b) On June 6, 2011, Mrs. Jennings informed Padgett and Worley of her plan to leave Lake House Academy for Girls and solicit key Lake House employees to terminate their employment contract with the organization.

(c) On June 29, 2011, Mrs. Jennings contacted Lake House's Clinical Director and solicited her to leave her employment with Lake House in favor of Glen Willow Academy.

(d) In July 2011, Mrs. Jennings contacted Servais and prompted him to conduct a property search and facilitate a lease agreement for a property to house Glen Willow Academy.

(e) On August 9, 2011, Mrs. Jennings caused Servais to submit a Letter of Intent on behalf of Mrs. Jennings and Mr. Jennings for the Glen Willow Property.

(f) On August 9, 2011, Mrs. Jennings circulated confidential and HIPPA protected parent contact information to Lake House parents and certain "friends" directing them to a website containing disparaging comments about the veracity and competence of the Lake House staff.

(g) On August 15, 2011, Mrs. Jennings and Mr. Jennings executed a Consulting Contract with Servais under which Carolina Country Realty would assist Mrs. Jennings and Mr. Jennings with "the operation and all facets of opening an all-girls Boarding School." (PI Hr'g, Ex. 22.)

(h) On August 23, 2011, Mrs. Jennings and Fawkes Tears executed a lease with PMG Properties LLC covering the Glen Willow Property.

---

[13] Lake House has not presented evidence adequate for the Court to conclude at this time that the documents in question are confidential.

(i) Mrs. Jennings solicited Tomes to resign as Academic Director of Lake House Academy for Girls and executed an employment contract with him on behalf of Glen Willow Academy on August 25, 2011.

(j) On August 29, 2011, Mrs. Jennings caused Servais to improperly delete Lake House documents from the laptop computer issued to her as Executive Director of Lake House.

{40} At the trial of this action, it may well be that Lake House is entitled to an adverse inference against Mrs. Jennings based on spoliation of evidence. The Court need not address this issue, but it is troubled by Mrs. Jennings and Servais' testimony regarding the laptop computer.

{41} All of the foregoing acts of Mrs. Jennings, Mr. Jennings, Fawkes Tears, Wilderness Properties, LLC, and Servais are consistent with the alleged scheme to open a competing entity that Mrs. Jennings laid out to Padgett and Worley in June 2011 when Mrs. Jennings undisputedly was both Executive Director and a member-manager of Lake House.

{42} Accordingly, Lake House has established that it is likely to prevail on the merits of its breach of fiduciary duty claim against Mrs. Jennings.[14]

## C. Irreparable Injury

{43} A party may show that it will suffer "irreparable injury" for which it has no adequate remedy at law where damages are difficult and cannot be ascertained with certainty. *See e.g., A.E.P.*, 308 N.C. 393, 406–07, 302 S.E.2d 754, 762 ("[O]ne factor used in determining the adequacy of a remedy at law for money damages is

---

[14] The Court does not address Lake House's likelihood of success on the merits of its claims for constructive fraud, breach of contract, tortious interference with a contract, misappropriation and threatened misappropriation of trade secrets, and unfair and deceptive trade practices due to the strength of the underlying breach of fiduciary duty claims. Plaintiff's claim for breach of the Confidentiality Agreement would appear meritorious, at least in part, but that claim is duplicative of the alleged breach of fiduciary duty. The Court does however, express suspicion as to the legal viability of some of Plaintiff's remaining claims. Specifically, the Court is suspect as to the validity of Lake House's claims against Mrs. Jennings for tortious interference with student enrollment contracts and misappropriation and threatened misappropriation of trade secrets.

the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach.").

{44} To establish irreparable injury under Rule 65,

> it is not essential that it be shown that the injury is beyond the possibility of repair or possible compensation in damages, but that the injury is one *to which the complainant should not be required to submit or the other party permitted to inflict*, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law.

*A.E.P.*, 308 N.C. at 407, 302 S.E.2d at 763 (citing *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949)) (emphasis in original).

{45} Clearly Lake House has been harmed. Mrs. Jennings actively solicited Lake House employees to terminate their employment and work for Glen Willow Academy, and she caused the release of confidential and proprietary parent contact information leading to parental unrest. When Mrs. Jennings was asked how the Target Population of Glen Willow differed from that of Lake House, she responded that the Target Population for the two schools is exactly the same.[15] (Testimony of Mrs. Jennings.)

{46} If Glen Willow Academy were to open its doors and compete with Lake House under these circumstances, such actions would unquestionably cause irreparable injury to organization. The opening of Glen Willow Academy, standing alone, would increase the competitive market for residential therapeutic boarding schools serving the Target Population by fifty percent (50%) and would likely halt or adversely affect the pending sale of Lake House to Innerchange.

{47} It is difficult, if not impossible, to assign a dollar figure to the damages Lake House may suffer in this case. The Court cannot quantify the economic loss attendant to the pattern of conduct revealed by the record. The Court cannot assess

---

[15] Cook is not listed as an individual plaintiff in this case. Mrs. Jennings's actions have caused similar injury to Cook. The evidence establishes that Cook's investment was predicated on Mrs. Jennings' representation that Lake House would be the only school on the east coast convenient to the Target Population. Within months of making this representation, Mrs. Jennings set in motion a detailed and calculated scheme to organize a competing school.

the impact of Glen Willow Academy's opening on the pending sale of Lake House, but all Parties agree that purchase price would be materially affected.

{48} The Confidentiality Agreement signed by Mrs. Jennings acknowledges the uncertainly of monetary losses flowing from the misappropriation of proprietary and confidential information by stating:

> [i]n the event of a breach of the covenants contained within this Section 3, EMPLOYEE acknowledges that injury to EMPLOYER would be significant, but damages from such breach would be difficult to determine.  Therefore, the parties hereby agree that should EMPLOYEE breach any provision of Section 3, EMPLOYER shall have the following rights, individually and collectively, but not exclusive of any other legal or equitable remedies that may be available: (i) monetary damages, insofar as they can be determined, including attorney's fees and expenses; (ii) injunctive relief and/or decree of specific performance to enforce this Agreement; and (iii) all other applicable remedies at law and in equity.

(Am. Compl. Ex. 2, ¶ 3(c).)  Similar language has been recognized as evidence of the inadequacy of monetary damages, and such an inference is supported by the evidence presented in this case.  *A.E.P.*, 308 N.C. at 406, 302 S.E.2d at 762; *See Amdar, Inc. v. Satterwhite*, 37 N.C. App. 410, 246 S.E.2d 165, *disc. rev. den.* 295 N.C. 645 (1978).

{49} Based on the foregoing, Plaintiff has carried its burden of proof and established a likelihood of success on the merits of its claim for breach of fiduciary duty and a likelihood of irreparable harm if an injunction does not issue.


D.   Weighing the Respective Interests

{50} Mrs. Jennings and Glen Willow Academy will suffer materially less damage or injury than Lake House if Glen Willow Academy is permitted to open and compete with Lake House during the pendency of this litigation.

{51} Glen Willow Academy has no student population, no operations, and no paid employees.  (Testimony of Mrs. Jennings; Testimony of Servais.)  Its only outstanding monetary obligation is the Glen Willow Property lease which was executed on August 23, 2011.  Under its terms, Mrs. Jennings and Fawkes Tears

were obligated to deliver a security deposit of twenty thousand dollars ($20,000.00) upon the execution of the lease, and remit periodic rent payments of thirteen thousand dollars ($13,000.00) for the first three (3) months and sixteen thousand dollars ($16,000.00) for months four (4) through sixteen (16).[16]  (PI Hr'g, Ex. 26.)

{52}  Nevertheless, Mrs. Jennings argues that her interest in operating Glen Willow Academy is paramount and that enjoining her from doing so abridges her Constitutional right to earn a livelihood and provide for her family.  While the Court recognizes the rights Mrs. Jennings asserts, the North Carolina Supreme Court has chosen not to enforce such an interest when it is asserted to obtain gains achieved by illegitimate and unscrupulous means.  In *A.E.P.*, our Supreme Court stated

> 'it is just as important to protect the enjoyment of an establishment in trade or profession, which its possessor has built up by his own honest application to every-day duty and the faithful performance of tasks which every day imposes on the ordinary man.  What one creates by his own labor is his.  Public policy does not intend that another than the producer shall reap the fruits of labor.  Rather it gives to him who labors the right by every legitimate means to protect the fruits of his labor and secure the enjoyment of them for himself.  Freedom of contract must not be unreasonably abridged.  Neither must the right to protect by reasonable restrictions that which a man by industry, skill and good judgment has built up, be denied.'

*A.E.P.*, 308 N.C. at 407–08, 302 S.E.2d at 763.

{53}  Mrs. Jennings remains free to pursue her chosen profession so long as she does so without infringing obligations owed to Lake House.  She is free to pursue her interests in the field of residential therapeutic treatment, but her continuing fiduciary obligation to Lake House inhibits her ability to organize and operate a competing facility serving the same Target Population.

{54}  Consequently, a preliminary injunction to maintain the status quo pending the final adjudication of this matter is likely to cause Mrs. Jennings and Glen Willow Academy materially less damage or injury in comparison to the risk or

---

[16] The Court is not sympathetic to the fact that Mrs. Jennings executed the lease with knowledge of or conscious ignorance to the possibility that litigation would ensue.

irreparable injury faced by Lake House if Glen Willow Academy is permitted to open as scheduled.

### E.  Security

{55}  Rule 65(c) requires that the grant of a preliminary injunction shall be conditioned upon the giving of security by the moving party in a sum determined by the Court to be proper for the payment of costs and damages that may be suffered by a party ultimately determined to have been wrongfully enjoined or restrained.

{56}  Neither Party has presented evidence as to the amount of the security in this case and the Court has no way to anticipate the course or duration of this litigation.

{57}  In its discretion, the Court concludes that to protect the interests of those impacted by this injunction, security in the amount of one-hundred thousand dollars ($100,000.00) is reasonable and appropriate as a condition of granting a preliminary injunction in this matter.

NOW THEREFORE, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it is hereby ORDERED that:

{1}  Pending final resolution of this civil action, and unless and until otherwise ordered by this Court, Mrs. Jennings and any persons or entities in active concert or participation with her are hereby RESTRAINED, ENJOINED, and FORBIDDEN from

(a)  Using, disclosing, or distributing any Confidential Information, as that term is defined in the Confidentiality Agreement, that Mrs. Jennings received by virtue of her status as a member-manager of Lake House;

(b)  Using, disclosing, or distributing any Confidential Information, as that term is defined in the Confidentiality Agreement, that Mrs. Jennings received by virtue of her status as the Executive Director of Lake House;

(c)  Further soliciting any Lake House employees;

(d)  Soliciting any current Lake House student or family;

(e)   Establishing, opening, owning, or operating Glen Willow Academy or taking any further actions to advance the purpose of Glen Willow Academy;

(f)  Taking any further actions which violate Mrs. Jennings' fiduciary duties as a member-manager of Lake House;

(g)  Destroying any documents, data, information, or property now or formerly in or under Mrs. Jennings' custody, possession, or control, including but not limited to electronic data and correspondence, which constitutes or could constitute evidence of any kind in this lawsuit.

{2}  Pursuant to the provisions of Rule 65(c), this Order shall become effective when Plaintiff Lake House Academy for Girls LLC has posted security ("Security") in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).  Said Security shall be in the form of a surety bond or other undertaking satisfactory to the Clerk of Superior Court of Henderson County, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by this Order.

{3}  Except as GRANTED by the terms of this Order, the Motion is DENIED.


IT IS SO ORDERED, this 13th day of October, 2011.